Gregis Corporation v. Kappos. And, Council, before we begin the actual arguments, we're not going to start the clock yet, I just want to be clear, because this case presents an unusual situation about separate issues coming up, and we've dealt with that by giving additional time and allocating it between the parties. And I just want to, just to be clear, how the time is going to be used and by whom. Mr. Alter, you've got 12 and 3. So 12 is for your main appeal, and then the 3 minutes for rebuttal, I presume, are not to rebut the cross-appeal, but rather to rebut whatever they say with regard to the main appeal. Am I correct about that? No, Your Honor, you're not correct. My understanding, what was put in my motion, was that I would go first, followed by previous counsel, followed by the government, and then I would have a chance to come back and rebut the cross-appeal. Both the main and the cross. Okay. And then... And that's, you're going to do that in your 3 minutes. Now, Mr. Daphne, you've split your 20, 10 and 10. So in your first 10, am I correct that you plan to, one, respond to the main appeal, and two, raise the cross-appeal? Correct. And then the government will have 10 minutes to respond on the cross-appeal, and then you will take 10 to respond to the government's response. Right? Am I right about that? It's my understanding I can use my rebuttal to respond to either appeal. Okay. Okay. But you don't anticipate, you're not, you're going to finish your 20 minutes, and then you'll have the final three. We all agree on that. But your rebuttal will be with respect to your cross-appeal issues. Yes. So you won't be talking about the issues in the suit. No. And the cross-appeal issues have been limited by previous order of the court, right? So it's the 397 and the APA issue. Exactly. And that's it. That's it. So it's my understanding we will go last after the government, because we're only dealing with their cross-appeal. They don't have a cross-appeal. You have a cross-appeal. That's correct. Okay. Yeah, but then you go, and then you finally wrap up in three minutes to respond to either one, or you think you did? No, the agreement was Mr. Arthur goes first, I go second, the government goes third, Mr. Arthur goes fourth, and I go fifth. So you have the last word, but only with respect to the cross-appeal. Okay, so, and that when you go last, that will be your final 10 minutes. Yes. So you'll use 10 at first, then the government will go, then Mr. Arthur will go, and then you'll go through the final 10, but just with respect to the cross-appeal. That's correct. We all good on this? Yes. Okay. Thank you. Sorry for the confusion, but I for one have never had a case that involved these separate issues, so I was a little confused. All right. Mr. Arthur, please proceed. May it please the court, this case boils down to three simple things. First, a jury that was misled repeatedly by prejudice arguing about features such as massive, firmly massive blocks, metal blocks that don't appear in the patent claims. Second, a computer animation never entered into evidence that was used to persuade a jury that all of the asserted claims were obvious. And third, an expert witness who admitted that he was not able to draw any conclusion on obviousness. The district court did not undertake an independent obviousness assessment to determine if there was any rationale to combine and modify the elements of the prior art to validate patents. At trial, prejudice is expert. Well, let me just go to the three points, the major points you raised then. It seems to me at least the first, so you can tell me why I'm wrong. It seems to me, arguably, the first two are really kind of things that are taken care of at the district court level. The district court decides what you can object, and the district court can decide what he wants to come in or stay out with respect to evidence. And the animation stuff here was used for purposes of testimony, as I read the record, but not entered into evidence. So it seems to me you're asking us, if you want us to go on those issues, you're asking us to really revisit all of these determinations made at the district court level about what should be allowed and what shouldn't be allowed. Am I misunderstanding your argument? Yes, Your Honor. You are misunderstanding it. First of all, with regard to the massive thermal blocks, that's contrary to the plain meaning of the claim term that we had at issue, which was a block that has a source of heat. You're reading limitations into the claims that was contrary to the district court's claim interpretation that said those words would get their plain meaning. With respect to the computer animation, what that goes to is the fact that there is no substantial evidence on the record of any articulated rationale for combining the prior art references. None whatsoever. However, when I asked Dr. Maslin about the obviousness of the particular patents in suit, Dr. Maslin answered. He said, I quote, I can. I think you can determine whether the terms of the patent appear in the prior art by combination. Again, it's my understanding, and this is why I'm being careful, that there is a step, an additional legal step in moving from establishing that the prior art shows or contains the words in the claim and calling it obvious. If the judge would like me to take the step of using the word obviousness under, I feel under duress because I have been advised by counsel that obviousness is a very specific legal construct. Dr. Maslin. Are you saying that you need? I'm sorry. I think that view that is saying the witness is uncomfortable giving a legal conclusion because he wasn't qualified as a legal expert. There is. I can't say obvious. I mean, it doesn't strike me that that's a very strong read for you to pitch your case on. This person saying, well, I'm sorry, I'm not going to get into whether it's obvious or anticipated. This case is like the image. He did say, he did say that any ordinary artisan could have put these various pieces of prior art together so easily. In fact, if somebody had been working for him and couldn't have done it, he'd acquired the actual ability to put the things together as a slam dunk. Plenty of evidence for the jury to hear that. Your Honor, he was asked leading questions about the elements being a design step within the level of ordinary skill to which Dr. Maslin answered by road. Yes, yes, yes. Energetic says such stock phrases do not prove obviousness as stated in the energetic case. Such vague testimony would not be helpful to a lay jury in avoiding the pitfalls of hindsight that belie the termination of obviousness. In Priestess's brief to patch up the flaw that they had in their expert witness testimony, they said that they were relying on alleged generalized trend to move from styrofoam peanuts to air pillow cushioning as a rationale to combine and modify. They established, I think, on the record that the consumers don't like the little pieces of plastic that go all over the place. I tried to put a big box of plastic out Sunday night for the recycled people, and the thing opened up and the wind blew them all over the street. Everybody knows about that problem, right? Right. And everybody knew that with the Internet coming on, there was more and more demand for packaging and the packaging that wouldn't have those problems, right? Yes, Your Honor. And your witness also testified to another disadvantage, didn't he? He said, there's a storage disadvantage. You have to store all those peanuts somewhere in your manufacturing company or in your shipping company where, with the invention, all you have to do is just inflate with a little machine. You inflate your own protective packaging, and there you have it. You solve the problem of the storage. The jury heard that. Yes, Your Honor. That's a problem that was identified as a problem to be solved. How much more under KSR does there have to be? There has to be an articulation. This testimony I'm just referring to is not testimony in the order, well, there's been a great increase in consumer demand because of the Internet. This is a very specific practical need of someone in a factory who's got all these loose pellets around that they don't want to have them around anymore. That doesn't give you the design of the specific machine for making air pillows. That was easy. All it is— Your Honor, as the court stated in the energetic case— I don't mean any fool. I mean any person. But that language is very, very strong when he said, you know, I would—anybody who worked for me that couldn't have taken these prior references and produced this machine to solve the storage problem, I would have fired him. Your Honor, knowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references to reach the particular claimed method. That's a citation. That, sir, I think is the $64,000 question under KSR. Yes, Your Honor. How much do you need by way of a suggestion or a motivation or an impetus? What problem out there that needs to be solved, especially in parts where there are not a jillion different possible solutions? Well, that's, in fact, what you have. You have a specific design that was claimed. Nowhere does this problem direct you to the specific design of the machinery and of the film. All it directed you to was a general demand that you're going to move from peanuts to air bubbles—I'm sorry, air pillows. As KSR said— Air pillows existed. Wasn't there some little hot dog shape of an air pillow in the prior art? Yeah, the air pillows existed. And several machines for making air pillows existed. Let's stop right there. So you have air pillows and machines that make air pillows. And then the benefit of the invention is it's a machine that makes air pillows. But what's the inventive space between the prior art machine that makes air pillows and your client's machine that makes air pillows? First of all, no air pillow machine was cited as prior art against these patents. They ignored those and went back to machines for making bubble wrap from the 1970s. Now, how the invention differed from the air pillow machines, which were around for the 10 years, relates to the planar path through the machine and drawing it in continuous and uninterrupted matter, where prior to that they were intermittent. And then also, with respect to the fuss patents, it was the heating through the belt and the efficiency, which you got so that you could have sealed air pillows that did not leak and that were filled in a uniform manner. This was an advancement over the air pillow technology. So just so I understand, all of this—there's no dispute that all of the limitations were found in the prior art. You're just arguing that there was no motivation or incentive to look to these specific pieces of prior art to combine them? Is that what your argument is? You could go to the prior art. You could pick out all different types of limitations, picking and choosing from those, and modify what was in the prior art to arrive at the claimed invention. You could not just take the prior art and just take that limitation and put it down. Right, and then there was very strong testimony that one of our areas of the art would be able to achieve those modifications. And that testimony, though, was— I understand. But what you're saying is that's not enough because there was, in your view, no testimony that there was any reason to do it. That's correct. Why did they—there had to be some articulated rationale as to why they picked and chose those particular references, then why they combined them, and then why they— In KSR terms, a problem they were trying to solve. And that generalized problem, though, does not direct one to the design of the apparatus. All that does is say that they want pillows as opposed to peanuts. How does that—how does the fact that there's a migration from styrofoam peanuts to pillows direct one to motivate—be motivated to select, combine, and modify specific elements from the different 1970s-era patents on bubble wrap machines? Those bubble wrap machines were never even made. Why would one look to the 1970 patents in the first place, except by hindsight, using the claimed invention patents as a guide to go back and see what depicted in this 1970s technology? As I indicated, 10 years before— The pillow—the prior pillow machine—pillow structure and pillow machines were also in evidence, weren't they? They were in evidence, and they do not render—there is no evidence. There was never any articulated rationale at all. The problem is, sir, we got a black box hearing verdict, right? So we're trying to figure out—or what we need to figure out is whether or not the jury that sits there and hears these things coming through the air. I mean, this testimony as to whether or not there were—the storage problem is enough to drive it. That came from your damages expert. So he's talking about damages, but the jury can hear anything from any source at any time, right? And if it's enough to patch together and to get it to its verdict, it works. Except that there is— But the jury knew about prior art pillows. They knew. As well as pillows. They knew. And then there were machines out there that made prior art pillows. Now, so they say to themselves, this patent is on a new machine to make prior art pillows. Is this new machine making prior art pillows patentable over old machines that made these things? And the jury heard a lot of testimony about the ordinary artisan's easy skill in being able to modify all these previous machines to do just about whatever they wanted to do with it. And that's sort of what's flowing into the jury's head. But there was nothing that showed the motivation to select the specific elements in the prior art. That was done by— Is it your argument that expert testimony was necessary in order to show that the prior art needed to be combined? In this particular case, there should have been expert testimony. In fact, if you take a look at a case— That made this case different from other cases because we haven't made expert testimony a requirement. In this case, you had complex technology. The prior art that was specifically relied on, the Larson 351 patent and the two Troy patents. The Larson 351 patent specifically said, column one, under the description of prior art— Was there a finding anywhere that this is complex science? Is there a finding? I mean, you just said that, but I wouldn't— The evidence establishes that it was complex. Because you think it was. Do you think the jury had trouble understanding how these machines worked? It's pretty simple, isn't it? Well, the jury was instructed by the court that the parties agreed the level of ordinary skill is a bachelor or master's degree in mechanical or chemical engineering, physics or chemistry, or several years of machine design work experience. That's in the appendix at 2924-25. That certainly falls beyond the grasp of an ordinary lay person. As this court stated in the Weyers v. Masterlock case, which was one that's dealt with common sense motivation combined, it did say, though, in addressing this issue about expert testimony, that the subject matter is sufficiently complex to fall beyond the grasp of an ordinary lay person. In such cases, expert testimony may be critical, for example, to establish the existence of a motivation to combine references. And that's at 616 Fed Third 1240 Note 5. Mr. Altha, you're far into your rebuttal time, so you want to save what's remaining and we'll restore a couple minutes.  Thank you, Your Honor. Thank you. All right, Mr. Dabney, we'll hear from you now. May it please the court. The prior art in this case included air-cushioned machines of various shapes and sizes and pre-configured plastic film in various shapes and sizes. The jury heard conflicting expert testimony over days and days about the problem-solving skill of a person having ordinary skill in New York. The defendant's expert took the position that a person having ordinary skill looking at a Troy 285 machine would be completely stumped and would see no way to combine them. The air pillows were already in the art, right? I'm sorry? Air pillows already existed. Absolutely. Okay, so I think maybe I'm misunderstanding. I think Mr. Altha's point, which I think is a fair one, is why would anyone combine a particular piece, go up to the prior art that's at issue here to make air pillows if air pillows were already known at the time and could be made in some other way? What was the motivation? Well, because there are two reasons. In addition to the market demand factors that Judge Clevenger referred to, the prior art itself defined a problem by virtue of its disclosure. And what I mean by that is you have a prior art machine that says it can make air cushions of various shapes and sizes. That's the Troy 285. And then you have prior art that shows the exact type of pre-configured plastic film that is claimed here. Those two prior art references together define a problem in the eyes of the law. What degree of skill is needed in order to adapt this machine in order to inflate this film? And as has happened over and over and again, the testimony in this case shows all air cushion machines have certain common features. They have this type of film that has an air channel in the center. Troy 285 is a pellet machine? Troy 285 was a machine that has all of the components of the claim subject matter but was configured in its preferred embodiment to create bubble. So that it has lots of sealing bands to create lots of long seals so that the… So it's saying we can have various shapes and sizes of bubbles. Yes. So bubble instead of being the small little thing that when you pop it makes a big noise it could be a great big sack. Exactly. Right? And when you stick it with a knife it goes… Exactly. Exactly. And the testimony was that if the desired end product was air cushions that had large pillows instead of small pillows, the obvious solution was simply to remove the unneeded sealing belts and run the previously known film into the previously known machine. Every single element… Computer animation showed that, didn't it? Yes, it certainly did. And on this question of demonstrative aids… What you did with your computer animations was you took a prior machine that was subject to being modified to produce a result similar if not exact to what we see in the patent and you did a computer animation showing it was happening. What the computer animation was intended to do was to illustrate the expert's testimony. It was presented to the jury without objection. I do not understand the argument that… Well, there was an objection raised on at least two or three occasions to having the computer animations in evidence. That's correct. The trial judge granted that motion, but he said, if I understand it correctly, you can use them for testimony. You use them as demonstratives, I believe was the word. Yes. For testimony or for argument, however you wish. Exactly. And I didn't understand there was any objection to the use of demonstratives for those two purposes. That's absolutely right. And the testimony in this case has to do with the question, which KSR and this court's precedents require in a case like this, is whether the improvement is more than the predictable use of prior art elements according to their established functions. The prior art shows an air inflation tube that slides into the air channel on the side of the film. It shows a sealing mechanism that applies heat and melts the film to trap the inflation gas. It shows a slitting mechanism that slices the film as it passes through the machine. And it shows all of the features claimed, including the planar path limitation. And in response to your Honor's question, Judge Clevenger, as to what is the inventive space, the record shows that the inventive space is incredibly narrow in this case because in order to stave off summary judgment, the patent owner had to gerrymander their claim so that the reason why they say this is not obvious is because the knife position is downstream rather than upstream of the inflation of the sealing mechanism, for example. Or the inflation tube is really long and extends through inflation, sealing, and slitting mechanism. And so it's those types of trivial distinctions that were urged early on in the case in order to prevent these claims from being declared anticipated by prior art. Now, Mr. Dabney, do you want to move on to your cross-appeal before your initial ten minutes run time? Yes. The government's position in this case really amounts to a direct challenge to the authority of this court. The government takes the position, inconsistently with the Hyatt case, by the way. The position the government is taking in this case is directly in tension with the Hyatt case. And the Hyatt case is going to be argued next month. The government is telling the Supreme Court again to reverse this court because they say patent grant and patent denial decisions are very simple. Well, let's look first at your position rather than at the government's position and the consistency of your position because that's what gives me a little trouble. You are pressing here that as an alternative, I guess, to what we think of as the normal procedures either in the PTO for re-exam or what we go through here on validity questions, that the alternative ought to be available to everyone out there to go after the PTO in an APA? Not at all, Your Honor. What are you suggesting? In order for a federal court to hear a case like this, there has to be a controversy. And there's no question in this case that there is a controversy. And the case of controversy requirement will screen out many, if not the great majority, of challenges to the PTO's reasons for doing that. What's the contest for a case of controversy on the APA a little different than a test for a case of controversy on the patent? Well, the— You're trying to pitch a—just back up and just assume that this had been brought solely as an APA cause of action. Yes. And you say, okay, we're suing David Kapos. Yes. Because we think he allowed a patent issue, shouldn't he? So he's the defendant, and his job is to come in and defend the patent. Correct? It's not enough for the plaintiff to say that. The plaintiff has to say that I am adversely affected or aggrieved by the grant of the patent because it purports to regulate my— Well, assume you were a consumer of the product. Yeah. A consumer of the product, and you were tired of paying the patented price. You're aggrieved, right? Yes, certainly. The whole class of people, I mean, the worry we had in Myriad about whether or not somebody had a standing would go away if you were to prevail here, right? Substantially go away. I would respectfully submit that most patents that issue are worthless. Most patents that issue do not. Let's get back to how the game plays out. So you file your lawsuit, and can the patent office plead in the patentee as a co-defendant? I think under Rule 19, the patentee could be deemed to be an indispensable party, and therefore, it could be required that the patentee be joined as a co-defendant. Could the patentee come in as a matter of right? I think they would have the right to intervene for certain. Okay. So probably in all likelihood, if you succeed, all of your cases there will be—you will be the plaintiff, and there will be two defendants. The patent office will be there, and Merck or IBM, they're going to be in there too, right? Because who on earth, if they had a patent, would just hope that the patent office could save it? So you're going to have the same lawsuit, right, you would have if you hadn't sued the PTO at all. Not at all, Your Honor. And this is the practical importance of this. And this case illustrates it graphically. The only difference between the claim under the APA and a garden-variety declaratory judgment claim is what is being reviewed. In the garden-variety declaratory judgment claim, what is being determined is the ultimate question of patent validity. Do these claims meet the statutory requirements, yes or no, according to the rules of litigation? In the APA claim, you're looking at something totally different. In the APA claim, you're looking at the agency's stated reasons for taking action. They cannot be arbitrary. They cannot be capricious. They cannot be unsupported by substantial evidence. Those issues are not a defense to a claim for infringement. Those issues are not grounds for a declaratory judgment of invalidity. The patent office is asking for all of the power of an administrative agency. I got rights. You can't reverse me except under the APA. Does it make any difference? I mean, you're saying, well, the patent office is going to review the reasons they gave for taking the action. And the reasons they gave was that they didn't find the claims obvious. They found the claims adequately described. They ran through the same testing devices that would be used in court. The difference is, did they act arbitrarily, capriciously, or in violation of law? That's the conclusion you get in an APA cause of action when you say the patent shouldn't have been issued. That's correct. And it's on the administrative record so that there's no discovery. It's inexpensive. It's to a judge rather than a jury. And the point is the stated reasons matter. And in this case, it really is important because everybody agrees in this case that the 397 patent issued for a stated reason that was factually incorrect. So what do we do with that? Without APA review, the agency never has a chance to go back and correct its own error. And in this case, the agency's error did the challenger no good. Remind us of what the stated reason that everybody agrees was incorrect is. The stated reason was, and we show a picture of it on page 17 of our brief. During prosecution, the applicant's attorney, not in bad faith, not equitable conduct, he just offered the uninformed but erroneous view that these transverse lines 35A interrupt the air inflation channel, and that's why the 397 patent was allowable over this record. And the examiner accepted that, said, I'm relying on the arguments of counsel. Everybody agrees that that was just simply incorrect. So now we're at trial, and the patentee is trying to defend the issuance of this patent on grounds completely different than they argued to the patent office. They concede it doesn't interrupt. That's a totally erroneous. They don't even try to defend it. And so what we have then is we have to try to prove by clear and convincing evidence. So they're saying that the error of the patent office was harmless error. No. Even if there's no interruption in the patent, they can still defend the patent. They can defend it with the benefit of the clear and convincing evidence rule. That's right. We have to show that. And that rule is alive and well. It is alive and well. It is absolutely alive and well, but it underscores the difference between APA review of the stated reasons for allowance and litigating the ultimate issue of patent validity where the unreviewed action. You're able to use the APA cause of action to undermine a patent under a standard, under a quantum of evidence test that the Supreme Court has rejected. You're in running I4I, right? Yes. I would say. Yes. I mean, you're running all the way around into the end zone. You think that'll make the Supreme Court happy? The patent office in Zerko started this. The patent office said, we're an agency, we're subject to the APA. Well, Zerko, that may have been implicated there, but that Zerko's holding has nothing to do with what you're pressing in this case. The Zerko was a procedure that was taking place under their appealing the PTO stuff to us, your routine garden variety. It was not pressing an APA action. So I understand they made that one little step, but I think that's a baby step relative to what you're asking us to do here, right? I want to save the rest of my rebuttal time, but I would respectfully submit that to say that patent grant and patent denial decisions should be subject to symmetric judicial review is exactly what they're arguing about. I want to ask you one other question because your answer may shock the patent office. As I understand it, what you get if you prevail in an APA cause of action is a ruling that the director acted arbitrarily, capriciously or in violation of law. Correct. And then maybe when you get that ruling, you go back and you go to him and you say, I've proven that you acted arbitrarily, acted against the law. In order for you to stop acting against the law, you have to cancel the patent. Don't you have to go back to the court isn't going to cancel a patent on the APA ruling. They're going to say, David Kapos violated the law. Right. What will happen? Yes. Okay. All right. If the issuance of a patent incorrectly is a violation of law, this will then become raw meat for whistleblowers. Because if an examiner is upset that his co-examiner is allowing a bunch of patents to issue that they shouldn't, he can blow the whistle. You can go to Kapos and say a violation of law is about to occur. Only if the plaintiff is adversely affected or aggrieved and has injury. A whistleblower gets paid to root out unlawful activity that either is happening or is about to happen in the federal government. So your theory will convert every person in the patent office who thinks a patent shouldn't be issued into a potential whistleblower. Go to Mr. Kapos and say I'm blowing the whistle on this examiner. And then all those actions are going to end up in court for MSPB and back over here. Candidly, I have not considered the possible whistleblower, whether or not a failure, you know, the allowance of a claim for unpatentable subject matter, whether that would give rise to a whistleblower claim. I doubt very much that that was the kind of act that the whistleblower statute would make actionable. But I honestly haven't considered that. And I would be surprised if there were not an interpretation of the whistleblower statute that would exclude that. You want to reserve the balance of the court. Thank you, Your Honor. Mr. McIntosh. Good morning, Your Honor. May it please the Court. Scott McIntosh, Department of Justice, appearing on behalf of the Patent Office. The government's position in this cross-appeal is simply stated. Our position is this. A potential infringer may not sue the PTO seeking retraction of a patent issued to another by reason of its improper allowance by the PTO. The remedy must avoid a confrontation with the patent owner. So in the Patent Office's view, is this a novel question? Because I know you point to various precedents in our syntax. Correct, Your Honor. But we've never really resolved this issue. Well, the words I just said, Your Honor, are actually the words this Court said in syntax. Everything you just heard. Do you think there's precedent? And do you think if this panel were inclined to go the other way, they would say, well, no, we can't do that absent going en banc? I think it would be extremely difficult to be candid, Your Honor. Now, let's take syntax as an example. The only difference between syntax in this case is syntax comes up in the re-exam context rather than the original examination. And in deciding whether APA review was available at the behest of the requester at the end of the re-exam process, the Court decided that by comparing it to the original exam and saying, look, you can't get APA review of an original examination decision, and re-exams work, ex parte re-exams work exactly the same way. So the Court in syntax itself equated the two cases, the two scenarios, the direct exam and the re-exam. But let me go a little bit further into syntax. If you look at the Court's reasoning in syntax, it's exactly the same reasoning that we're relying on here. The Court said, look, the re-exam process, at least at that time, was an ex parte process. There was no role for the requester in the re-exam process once it had been initiated. And for the patent owner himself, there could be a judicial review at the end of that process if the results were adverse, but only after the administrative process itself had been exhausted. If you look at the original examination process, it's exactly the same thing. Only the patent applicant participates in it. It's ex parte. There's no role for some third party to come in and participate in that process. And if the patent applicant is dissatisfied with the examiner's decision with the final office action, the applicant doesn't have the luxury of going straight into court. The applicant has to go to the board, get the board to review it, exhaust administrative remedies, and only then, if necessary, pursue judicial relief. On the process being urged on you here, while the patent applicant would have to go to the board, the third party, the potential infringer, if some of the claims were allowed, could go straight into court. So you could have one and the same thing. Well, that's the problem a lot of people have with the APA. I mean, you can't change that. That's what Congress enacted when it enacted the APA. What do you say to Mr. Dabney's argument that, at least in the context of this case, for example, on the 397 patent, that the question of whether or not there was an adequate remedy really is different, and there wasn't an adequate remedy under the circumstances here where the PTO actually, that there was some problem below and they can remedy it in a judicial proceeding? Let me respond to that in a couple of ways, Your Honor. First, just to make clear, that argument about the adequacy and the remedy goes to only one of the two theories in play here. It does not go to whether judicial review is precluded under 5 U.S.C. 701A1. It goes to the 704 argument about adequacy of remedy. So even giving that argument all the due that it can get, it doesn't carry any ice in terms of preclusion of review. You'll recall in Syntex, for example, the claims that were made in Syntex were essentially procedural claims, objections to the procedures followed in the course of the re-exam. There'd be no opportunity to raise that as a grounds for, as a defense in any future infringement action, any objection to procedures. It's not 282 defense. And so the fact that it was sort of now or never for that claim is irrelevant to preclusion. The same thing was true in Block, where for the consumers it was now or never. There was no other venue in which they could raise it. So I just want to make that clear at the front end. It has no bearing on preclusion. As far as the adequacy of the remedy. Would there be a difference in a potential infringer suing the PTO where he's seeking a correction of an issue panel, as opposed to the retraction of a panel? I don't think so, Your Honor. I don't think there's any. I haven't thought that scenario through, but I don't think there's anything about the structure of the review provisions. You pointed out that there was an error that you can look at and say, yes, I didn't make a mistake here. Let's correct this error. Well, of course, there are the re-exam procedures, Your Honor. One of the other important features to keep in mind here. Would a potential infringer be able to sue the PTO for that? Well, the potential infringer, the re-exam mechanisms as they now exist, provide another avenue for approval. I'm aware of that. And so at the end of that process, at the end of an inter-parties re-exam, the statute explicitly authorizes judicial review at the behest of either disappointed party. So I'm not sure I'm responding to Your Honor's question, but that is an avenue. And I think it's important to keep the re-exam provisions as a whole in mind. I mean, a lot of the objections you're hearing here, Mr. Dabney, are, look, remitting me, remitting patent potential infringers, to the machinery, the traditional machinery of defending a super infringement. Let me talk to you about a broader range of aggrieved persons than would be an infringer or maybe even a competitor. What about the patient who is paying a huge amount of money for a particular pharmaceutical? And they happen to think, based on the rule 11, they're going to get good lawyers to say the patent's invalid. And they want to challenge the patent. They can't bring a patent infringement suit. Right? I'm sorry, I can't. I'm talking about someone. I'm looking through aggrieved persons in the APA context. Someone who believes that the spotted owl ought to be kept around. Right? Yes. That's a good idea. And so they bring an APA cause of action because the Corps of Engineers are going to cut all the trees down. They've got the spotted owl. And they have standing to bring the APA cause of action. So what I'm hypothesizing is a person outside of the range of what we've been talking about, who's clearly going to be involved if we decide the patent office can be sued under the APA, then whoever is an aggrieved person for purposes of APA for having the patent be issued, has a legit complaint, is going to bring the lawsuit. So aren't the courts going to be flooded? You know the Myriad case. In the Myriad case, there was a serious concern as to whether most of the plants had standing. If they had been suing the patent office for the unlawful issuance of those patents, presumably they would have had standing. There's no question, Your Honor, that if you were to recognize the kind of APA suit that's been pressed here, you're going to be opening the door for a much broader body of litigation. Here's the next question. So what's wrong with that? This is America. It hasn't the Supreme Court told us in ZERCO this is an APA agency. It is an APA agency. But isn't that where ZERCO connects? It doesn't connect through a would-be infringer or a competitor with a patent. It connects through the PUBLIC, the aggrieved public. There's no question that the PTO is an agency under the APA. Our theory is not that it's not an agency. We look to the terms of the APA to decide how this APA action should come out. And the very first thing that we run into is – Does my plaintiff, my plaintiff whose family net worth has been wiped out by paying hundreds of thousands of dollars for this pharmaceutical, and let's assume that that person has standing to challenge the patent, does that person have an adequate remedy other than suing the patent office? That person, if there's no – Yes or no? If there's no realistic prospect of engaging in litigation, which I think is what you're positing, then there would not be an adequate remedy under 704 for that person. And are we sure that the Congress meant for that person to be non-suited? That's your other test. Well, that's what comes out of the structure of the statute, Your Honor. We've got a statute which – The structure of the Patent Act. Correct. But the Patent Act is – I took it off the table. With respect, Your Honor, I don't think you can really take it off the table. The question that is posed by the – Well, the Patent Act, everything about the Patent Act is there are two parties. There's the infringer who has some sort of standing, and then there's the patentee. It doesn't – Congress wasn't thinking in any way, shape, or form about a different public person. Now, how can you prove to us that Congress thought about that idea and rejected it? There's nothing I can see in the text of the statute that deals with that. There's no legislative history about that. I guess a couple of things, Your Honor. First, the re-exam provisions are open to anyone. So even your interested third person who's not a potential competitor can invoke the re-exam provisions. Second, even if one were to conclude that a consumer might – that the structure of the Patent Act doesn't preclude APA suits by consumers, that wouldn't – We've held that the re-exam is open to anybody. There are no standing requirements at all. I think any person can ask the court, can ask the PTO to initiate a re-examination, I believe. I mean, it's ordinarily competitive, but I don't think it's any – An uninterested person, someone that comes in and says, I'm just like a magnusons for the Patent Office. I have no skin in the game at all. The Patent Office, there's a threshold showing it has to be made to get the re-examination process going. So it's not as if anyone can simply come in and knock on the door and trigger it automatically. But more generally, Your Honor, you have to look at the overall structure of this scheme and ask yourself, has Congress attended with care to deciding how the agency's patenting decisions are going to be taken up by the courts? And the answer is it's attended to that with extraordinary care and extraordinary detail. It's done so both in the direct review provisions that govern this court's jurisdiction and district court's jurisdiction, and it's done so in the re-exam provisions where it's come back again and again and again to adjust those over time, most recently in the AIA just a few months ago. So we want to wrap up a final sentence for over time here. My final sentence would be, Your Honor, that this court should adhere to its holdings in syntax and ALDF and leave the law as it stands in terms of what it will do. Thank you. I wish you stored three minutes or a couple minutes, Gio. Thank you, Your Honor. Very quickly, just a few points. The problem with what Pregis argues is the motivation, that is, the problem moving from peanuts to air pillows, is that if you accept that, then every air pillow machine patent that comes after the rise of the Internet is invalid, regardless of how it's combined. Now, Pregis also suggested that Dr. Maslin's testimony… Well, that everyone except the one that wanted ordinary skill in the art wouldn't have had the talent to modify. Provided that you had specific… Sure. I mean, in this case, the testimony was that the ordinary artisan wouldn't have had the skills to do the modifications. It's certainly possible that you'll have a new air pillow machine that somebody would say, I don't know how the hell they ever got that thing built. Your Honor, I believe if you look closely at that testimony, you'll see that what Dr. Maslin testified to was that one skilled in the art could have combined. That's not adequate under the case law of this Court. There has to be an articulated rationale supporting the motivation to actually combine the prior art references and to modify the prior art references. Knowledge of a problem and motivation to solve that problem is different from motivation to combine particular references to achieve a particular combination of the patented invention. You don't have that in this case. There is no substantial evidence on the record to support that rational… articulated rationale for making the combination. Additionally, Mr. Dabney argued that this case was like KSR. In KSR, the market demand motivated the specific components. It was merely a substitution of electronic controls for mechanical linkage. The market wanted that, and that was a specific driver of the specific elements of the design. You don't have that in this case. This case doesn't have any evidence of a migration from bubble wrap design to air pillow design. It's not merely a substitution of an off-the-shelf item, as in KSR. You had to modify these bubble wrap patents from 1970 in order to arrive at the air pillow inventions. What about the prior art that itself taught, Okay, we're making bubble wrap with tiny little bubbles, but you can make them in any shape or form you want. But it was still bubble wrap, Your Honor. And in particular, Larson talked about those patents, and Larson… Well, if bubble wrap gets to be… the bubbles are the size of this, big pieces have little bubbles, and the plastic is thin, it begins to look like a pillow, doesn't it? Well, you still have to have cellular cushioning. That's exactly what those patents said. They were making cellular cushion, which was small cells. The patents itself said it could be other sizes. If you look at the 285 patent, the sizes that it's talking about is from a half inch to three inches. It doesn't suggest anything about large air pillows, right? And it clearly doesn't suggest anything. Your adversary said they were saying it could be made of any size. And if you read the next ten lines after that, I believe it's in column 13 of the 285 patent, lines 1 through 10. It goes on to define what the sizes that they're talking about, and the sizes are a half an inch to three inches. Now, in particular… Do you have a final thought? The final thought is I would ask the court to take a close look at how the facts in this case are similar to the InnoGenics case. This is directly on the court. Thank you, Your Honor. Thank you. Now, Mr. Dabney, we'll add a couple minutes to your time because everyone else has extended theirs. Thank you, Your Honor. Taking the points that came from the bench in turn, neither Syntex nor ALVF includes any holding on whether the Patent Act impliedly precludes a court from reviewing PTO grant decisions. This is a question of first impression for this court. I was going to ask the government. Is this question pending in any other forum currently? The question of the rights under the APO? I'm not aware of a case currently that raises this question. And you can see that most clearly, but neither opinion discusses this enormous body of case law in the Supreme Court that determines whether a statute is or is not going to be deemed to preclude judicial review. In the Syntex case, this court said that, quote, a potential infringer may not sue the PTO seeking retraction of a patent issued to another by reason of its improper allowance by the PTO. You're saying that doesn't apply here? That statement is not the holding of the case. If that statement were true, then you'd have to agree with the government. Our position is that dicta in that case does not address whether the Patent Act precludes judicial review. That dicta was stated in the context of an opinion that framed the question, does the Patent Act create an implied right of action? And under Court v. Ash and that whole line of authority, the Patent Act rightly does not create an implied right of action. It's not there. But after Zerko, that case was decided 10 years before Zerko. As Judge Cleventier said, Zerko changed everything. The government successfully persuaded the Supreme Court to say the Patent Act doesn't stand alone. You cannot analyze these questions solely in terms of what the Patent Act expressly or— But can't we consider in this context the fact that Congress has legislated, in fact, so recently dealing with the whole question at issue here and re-exams and the whole process? And, in fact, even the Supreme Court in I4I, I think, specifically pointed out, you know, this is an area in which Congress has had the consistent opportunity to make a variation, and they have not. Why shouldn't we be affected by that? Well, first of all, until the metamutant case, there would not have been this type of claim because there was this hard bar to bringing actions without reasonable apprehension of suit. So it's only been a few years that this type of claim would have been possible as a constitutional matter, number one. Number two, the AIA does not provide for any type of administrative review of the agency's reasons for issuing a patent. What the AIA does— No, I know, but that's not the point of my question. My question isn't that they've already covered it. It's that Congress considered what avenues were necessary in order to resolve whatever issues they were, and they didn't point to the APA. They came up with their own variation. So, yeah, obviously no one's contending that they provide an absolute substitution for APA, but they considered the need, and they addressed it, right? If the suggestion is that the America Invents Act impliedly precludes this claim for relief, I don't think that's a fair inference of the AIA, number one. And number two, what we're talking about here is symmetry between patent grant and patent denial decisions. The government rightly says it's irrational for a patent denial to be subject to judicial review, but a patent grant isn't. It's irrational to say, I cannot be arbitrary when I say no, but I can be arbitrary when I say yes. But a patent grant is subject to review. That's why we're here on all of these cases, because there is an avenue in which one would challenge validity based on all sorts of things. So to say a patent grant is not subject to review, I'm not sure is an accurate picture. But it is accurate, because now with I4I, it is very clear that the only issue in an invalidity defense is the ultimate question of validity. Was the statute satisfied by these claims? It's not a defense to say that the expert agency didn't do its job and gave an erroneous, frivolous, arbitrary reason for issuing the patent. The government is saying that although we are subject to the APA's constraints when we say no, and we got to have good, well-supported reasons to say no, if we frivolously, arbitrary, capriciously say yes, well, then we just set loose this patent that can be used to rip people off and cause damage and hold up attempts, and there's nothing anybody can do about it. This court has no office to perform. Let me ask you just a technical question, and that's because the 397 patent here, you already found not to infringe that patent. That's correct. So you have no sort of – you're not aggrieved by the enforcement of this patent at all, are you? So why doesn't that affect our analysis here? Because that patent could potentially be asserted against other products of Pregis in the future. They were allowed to hold onto it. Isn't that too speculative for us to rule on? No, under the Morton Chemical case, the Supreme Court has held clearly that a verdict of non-infringement and a judgment of non-infringement does not render moot a counterclaim seeking an invalidity determination, or in this case, an APA determination. So the Supreme Court in 1993 specifically addressed that question and said no, this court does have jurisdiction to hear the invalidity defense. With regard to the flooding point, I recognize that, but I think that basically is a policy argument that goes way beyond what the government has to work with here, which is an argument that the Congress supposedly intended in 1952 but just failed to express its intent to preclude courts from reviewing whether the agency has acted arbitrarily and capriciously and without substantial evidence when it says yes. Practical consequences are something that we don't know because there are the facts out there, but it isn't very hard to imagine the sky falling on the patent office if you prevail. I mean, they don't have enough staff to keep up with applications, with appeals, if Mr. Capos has to defend himself in hundreds and hundreds of cases. I would say several things about that. First of all, the standing rules screen out many, many claims. You have to be within zone of interest. You have to be adversely affected or aggrieved. There has to be causation. There has to be regressibility. All of the standing rules still apply, number one. Number two, as Your Honor suggested, the patentee is almost certainly an indispensable party, and the patent office doesn't have to defend its handiwork in the context of an APA suit any more than it has to defend its handiwork in an infringement case. So there is not necessarily any further requirement that the patent office participate in a case like this than there is that it participate in defending the validity of its decision. Then what's the purpose of hailing them in? The purpose of hailing them in is I believe they are a necessary— the APA right of action is a right of action against the government, so there's no way to avoid naming them just like the patent owner must formally be a party to a claim for infringement. It's a statutory requirement, but that doesn't necessarily mean that the patent-owning entity has any active role in the adjudication of a patent case. I think your time has expired. Thank you. Thank you very much for your attention.